IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No.   **GD 09-016892** |
| v. | ) ) ) | |
| | ) ) ) | **COMPLAINT** |
| J.P. MORGAN SECURITIES INC., J.P. MORGAN MORTGAGE ACQUISITION CORP., J.P. MORGAN MORTGAGE ACCEPTANCE CORPORATION I, CHASE HOME FINANCE L.L.C., CHASE MORTGAGE FINANCE CORPORATION, J.P. MORGAN CHASE & CO., MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Filed on behalf of: Plaintiff.<br><br>Counsel of Record<br>For this Party:<br>Lynch Weis, LLC<br>Daniel P. Lynch<br>PA ID No. 68280<br>dlynch@lynchweis.com<br>William J. Wyrick<br>PA ID No. 70656<br>bwyrick@lynchweis.com<br>501 Smith Drive, Suite 3<br>Cranberry Twp., PA 16066<br>T: (724) 776-8000<br>F: (724) 776-8001 |
| Defendants. | ) ) ) ) ) ) ) ) | |
| **JURY TRIAL DEMANDED** | ) ) | |

81031904. 2

1

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) | No. **GD 09-016892** |
| v. | ) ) | |
| J.P. MORGAN SECURITIES INC., J.P. MORGAN MORTGAGE ACQUISITION CORP., J.P. MORGAN MORTGAGE ACCEPTANCE CORPORATION I, CHASE HOME FINANCE L.L.C., CHASE MORTGAGE FINANCE CORPORATION, J.P. MORGAN CHASE & CO., MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
The Allegheny County Bar Association
920 City County Building
414 Grant Street
Pittsburgh, PA 15219
(412) 261-5555

81031904. 2

2

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | ) ) ) | CIVIL DIVISION |
| Plaintiff, | ) ) ) ) | No. |
| v. | ) ) | |
| J.P. MORGAN SECURITIES INC., J.P. MORGAN MORTGAGE ACQUISITION CORP., J.P. MORGAN MORTGAGE ACCEPTANCE CORPORATION I, CHASE HOME FINANCE L.L.C., CHASE MORTGAGE FINANCE CORPORATION, J.P. MORGAN CHASE & CO., MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., and FITCH, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

AND NOW, comes the Plaintiff, Federal Home Loan Bank of Pittsburgh ("Pittsburgh FHLB"), by and through its undersigned counsel, Daniel P. Lynch, William J. Wyrick, and the law firm of Lynch Weis, LLC, and files the within Complaint, and in support thereof, states as follows:

## PARTIES

1.     Pittsburgh FHLB is a federally chartered bank, which is owned by its approximately 320 member financial institutions located in Delaware, Pennsylvania, and West Virginia, with headquarters at 601 Grant Street, Pittsburgh, Allegheny County, Pennsylvania 15219.

2.     Pittsburgh FHLB is one of twelve Federal Home Loan Banks created by Congress in 1932 to ensure available funding for mortgage loans. Throughout its existence, the Federal Home Loan Bank System has been a fundamental part of the country's financial system, like the

Federal Reserve System or the Federal Deposit Insurance Corporation. More than 8,000 U.S. lending institutions—about 80% of those eligible—are members of a Federal Home Loan Bank and rely on a Federal Home Loan Bank for funds.

3.      The primary purpose of the Federal Home Loan Banks is to provide members with liquidity. Most community financial institutions do not have the ability to access credit markets on their own. For the majority of members, the Federal Home Loan Banks are the only source of credit market access.  In addition to providing its members with access to credit markets, Pittsburgh FHLB also, historically, provided its members with a dividend—at least it did so until the losses caused by the Defendants and others forced it to suspend the payment of a dividend in late 2008.

4.      Defendant J.P. Morgan Securities Inc. ("J.P. Morgan Securities") is an investment bank, with headquarters at 270 Park Avenue, New York, New York 10017.  J.P. Morgan Securities acted as a seller and participant in the distribution of all the securities in this action.

5.      J.P. Morgan Mortgage Acquisition Corp. ("J.P. Morgan Acquisition") is a Delaware corporation whose address is 270 Park Avenue, New York, New York 10017.  J.P. Morgan Acquisition was the "seller/sponsor" and participant in the distribution of the securities bearing CUSIPs 46628LAS7, 46628YAW0, 46628YAC4, 46632BAH7, 46632BAE4, 46632DAK6, and 46632DAB6.

6.      J.P. Morgan Mortgage Acceptance Corporation I ("J.P. Morgan Acceptance") is a special purpose Delaware corporation headquartered at 270 Park Avenue, New York, New York 10017.  JP Morgan Acceptance was the depositor, issuer, seller, and/or participant in the distribution of the securities bearing the CUSIPs 46628LAS7, 46628YAW0, 46628YAC4, 46632BAH7, 46632BAE4, 46632DAK6, and 46632DAB6.

7.      Chase Home Finance L.L.C. ("Chase Home Finance") is a Delaware limited liability company whose address is 194 Wood Avenue South, Iselin, New Jersey 08830. Chase Home Finance is a wholly owned subsidiary of Chase Home Finance, Inc., a Delaware corporation, who in turn is a wholly owned subsidiary of J.P. Morgan Chase & Co. Chase Home Finance was the "seller/sponsor" and participant in the distribution of the securities bearing CUSIP 161639AG4.

8.      Chase Mortgage Finance Corporation ("Chase Mortgage Finance") is a Delaware limited liability company whose address is 194 Wood Avenue South, Iselin, New Jersey 08830. Chase Mortgage Finance was the depositor, issuer, seller and/or participant in the distribution of the securities bearing the CUSIP 161639AG4.

9.      J.P. Morgan Chase & Co. ("J.P. Morgan Chase" and together with J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Morgan Acceptance, and Chase Home Finance, "JPMorgan") is a Delaware corporation whose principal office is at 270 Park Avenue, New York, New York 10017. J.P. Morgan Chase owns and/or controls J.P. Morgan Securities, J.P. Morgan Acquisition, J.P. Mortgage Acceptance, Chase Home Finance, and Chase Mortgage Finance.

10.      Defendants Moody's Corporation and its wholly owned subsidiary Moody's Investors Service, Inc. (collectively, "Moody's"), which have their headquarters at 250 Greenwich, New York, New York 10007, provide credit rating services and assist in the structuring of mortgage pools. Moody's was a participant in the distribution of the securities bearing CUSIPs 46628LAS7, 46628YAW0, 46628YAC4, and 161639AG4.

11.      Defendant The McGraw-Hill Companies, Inc. and, at all relevant times, its business division Standard & Poor's Ratings Services (collectively, "S&P"), provide credit

rating services and assists in the structuring of mortgage pools. As of January 1, 2009, the rating and structuring business of The McGraw-Hill Companies, Inc. operates as Standard & Poor's Financial Services LLC, a wholly owned subsidiary of The McGraw-Hill Companies, Inc. Its headquarters are located at 55 Water Street, New York, New York 10041. S&P was a participant in the distribution of the securities bearing CUSIPs 46632BAH7, 46632BAE4, 46632DAK6, and 46632DAB6.

12.    Defendant Fitch, Inc. ("Fitch" and together with Moody's and S&P, the "Rating Agencies") is a wholly owned subsidiary of Fitch Group, which in turn is primarily owned by Fimalac, a French holding company. Fitch, which is also known as Fitch Ratings, provides credit rating services and assists in the structuring of mortgage pools, and has its headquarters at One State Street Plaza, New York, New York 10004. Fitch was a participant in the distribution of all the securities at issue here.

<u>**JURISDICTION AND VENUE**</u>

13.    The claims asserted in this Complaint arise in part under §§ 11, 12, and 15 of the Securities Act. 1933 Act, 15 U.S.C. §§ 77k, 77l, and 77o, and Pennsylvania statutory and common law.

14.    The claims under §§ 11, 12 and 15 may be brought in state or federal court, and when brought in state court are not removable. Section 22 of the Securities Act states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States." Section 16(c) refers to "covered class actions," but this action is not brought on behalf of a class. Accordingly, the present action is not a "covered class action" under Section 16(c) and is not removable to federal court.

15.     No diversity of citizenship exists between the parties. Pittsburgh FHLB is a federally chartered organization that operates nationwide and is therefore a citizen of every state. Accordingly, this action does not involve diversity jurisdiction.

16.     Personal jurisdiction over the Defendants is proper under 42 Pa.C.S.A. § 5322 and 42 Pa.C.S.A. § 5301(a)(2)(iii).

17.     Venue in this Court is proper under Rules 1006 and 2179 of the Pennsylvania Rules of Civil Procedure because the violations of law set forth in this Complaint occurred in this County, including the dissemination of materially false and misleading statements. The Defendants conduct or conducted business in this County.

## NATURE OF THE ACTION

18.     In this action, Pittsburgh FHLB seeks damages for the losses it has and will sustain due to Defendants' violation of federal and state law. In 2006 and 2007, Pittsburgh FHLB purchased—from, through, and because of the Defendants—$1.5 billion of mortgage-back securities ("MBS"). Unlike the MBS that have garnered so many headlines, these MBS were not backed by subprime mortgage loans. Because Pittsburgh FHLB is responsible for providing liquidity to its members, it has adopted a conservative investment approach. Its exposure to the subprime market is negligible, and the loans that backed the MBS here were represented to be loans made to "prime" borrowers. Pittsburgh FHLB also invests only in bonds that receive the absolutely highest credit rating—"AAA"—and each of the bonds at issue here received that rating by at least two credit rating agencies. And yet, these bonds are now worth only a fraction of their par value.

19.     A residential mortgage backed security, also called a bond or certificate, represents the right to receive a portion of the cash flows generated by a collection of residential

home mortgage loans. These loans are selected by a sponsoring entity and placed into a special purpose vehicle called a Trust. The mortgage loans in the Trust have varying underwriting characteristics such as the type and extent of documentation relied on by the loan originator, loan-to-value ratio (LTV), borrower's credit score (known as the FICO score), the location of the property, and the like. The rights to the cash flows from these mortgage loans—the payments of principal and interest—are divided into "tranches." The more senior tranches receive payments ahead of junior tranches, and therefore the junior tranches absorb losses before those losses affect the more senior tranches. This form of credit support or enhancement for the senior tranches is know as subordination.

20. The sponsor of the Trust and the sellers of the bonds to be issued by the Trust work with the credit rating agencies to structure the tranches and determine the level of credit enhancement for each tranche. The Rating Agencies then assign a rating to some or all of the tranches, for which they are paid a fee. Bonds with the highest quality are rated AAA. Although the rating symbols used by each of the Rating Agencies vary somewhat, generally bonds are rated on a scale that runs from AAA, AA, A, BBB, BB, B, CCC, CC to D. Bonds that are considered investment grade are rated BBB and above. Bonds that are considered non-investment grade ("junk bonds") are rated BB and below, and these bonds are considered either speculative, highly speculative ("B" grades), extremely speculative ("C" grades) or in default ("D"). Interest rates generally increase as the rating on the bond decreases to reflect the level of risk assumed by the investor.

21. Credit ratings are intended to be comparable across different types of fixed income instruments. Moody's has said: "The comparability of these opinions holds regardless of the country of the issuer, its industry, asset class, or type of fixed-income debt." Similarly,

S&P has stated: "Our ratings represent a uniform measure of credit quality globally and across all types of debt instruments. In other words, an 'AAA' rated corporate bond should exhibit the same degree of credit quality as an 'AAA' rated securitized issue." The default rate on investment grade corporate bonds from 1981 to 2008 has averaged about 0.106% with no year higher than 0.41%. This is consistent with the charge-off rate for 1-4 family first-lien home mortgage loans made at commercial banks. Between 1992 and 2006 the average charge-off rate was 0.168% and never exceeded 0.348% annually. In short, a purchaser of a AAA-rated residential MBS should have virtually no risk of incurring any loss.

22.     In 2006, based on the representations regarding underwriting standards found in the prospectuses, supplements, and other offering materials, and on the represented credit ratings, Pittsburgh FHLB purchased three MBS from the Defendants. Each of these purchases appeared to be consistent with Pittsburgh FHLB's conservative investment strategy: two of the 2006 certificates were backed by prime, 30-year, fixed rate mortgages; one of the certificates was backed by prime, 30-year, hybrid adjustable rate mortgages ("ARMs"); and all three bonds received AAA ratings from two rating agencies. While Pittsburgh FHLB did not know it at the time, the Defendants had misrepresented the underwriting standards used when the loans were made and misrepresented the credit quality of the bonds backed by those mortgage loans.

23.     The housing market peaked in July 2006, and by mid-2007 the subprime market was ravaged by defaults. Loan originators acknowledged that underwriting standards for the subprime market needed to tighten. At the same time, the rating agencies downgraded thousands of subprime MBS and vowed to tighten their rating standards.

24.     Pittsburgh FHLB continued to invest in MBS, feeling secure that its decision to stay away from subprime MBS had been wise, and believing, based on the Defendants'

representations, that the problems in the residential MBS market were confined to the subprime

sector of that market.  In late 2007, Pittsburgh FHLB purchased additional MBS from the

Defendants, again focusing solely on what the Defendants represented were high quality, low

risk investments.  All of the 2007 bonds that Pittsburgh FHLB purchased from the Defendants

were backed by prime hybrid ARMs and received at least two AAA ratings.

     25.     The underwriting standards and the credit quality ratings, however, continued to

be misrepresented in 2007.  Loans were made to borrowers, even borrowers labeled as "prime,"

who did not have a reasonable prospect of repaying the loan.  Moreover, Defendants were aware

of the deterioration in underwriting standards, the increased use of low documentation or no

documentation loans, the increase in mortgage fraud (either by the borrowers, loan brokers, or

loan originators), and the decline in housing prices, but they continued to provide ratings,

including AAA ratings, even though the models used by the Rating Agencies were incapable of

predicting the levels of default under these circumstances.

     26.     By the fourth quarter of 2008, the credit enhancement for Pittsburgh FHLB's once

AAA-rated investments had been eaten away by defaults, and it was required to begin

recognizing Other Than Temporary Impairment (OTTI) on investments in the MBS purchased

from the Defendants.  All of the bonds purchased from the Defendants that are the subject of this

Complaint are presently worth about 60% of their original value, and all of these bonds have

been downgraded by Fitch to CCC or CC, which are ratings that are well below investment

grade.  In other words, the bonds purchased by Pittsburgh FHLB that were represented to be of

the highest quality were actually junk.  Because the Defendants knew, should have known, or

were reckless in not knowing the true quality of the bonds, Pittsburgh FHLB seeks redress in this

Court.

## SUBSTANTIVE ALLEGATIONS

### A. Plaintiff's Purchasing Decisions

27.     In 2006 and 2007, Pittsburgh FHLB purchased the following Certificates from

JPMorgan, each identified by the last three or four characters of their respective CUSIPs:

| JPMorgan Issuing Trust & CUSIP | Date Purchased by Plaintiff | Underwriters |
|---|---|---|
| JP Morgan Mortgage Trust 2006-A4<br>    CUSIP: 46628LAS7 ("LAS7") | 5/23/06 and 5/24/06 | JPMorgan, Moody's, Fitch |
| JP Morgan Mortgage Trust 2006-S2<br>    CUSIP: 46628YAW0 ("YAW0")<br>    CUSIP: 46628YAC4 ("YAC4") | 7/28/06 and 8/10/06 | JPMorgan, Moody's, Fitch |
| JP Morgan Mortgage Trust 2007-A5<br>    CUSIP: 46632BAH7 ("BAH7")<br>    CUSIP: 46632BAE4 ("BAE4") | 9/25/07 | JPMorgan, S&P, Fitch |
| JP Morgan Mortgage Trust 2007-A6<br>    CUSIP: 46632DAK6 ("DAK6")<br>    CUSIP: 46632DAB6 ("DAB6") | 11/15/07 | JPMorgan, S&P, Fitch |
| Chase Mortgage Finance Trust Series 2007-A3<br>    CUSIP: 161639AG4 ("AG4") | 12/18/07 | JPMorgan, Moody's, Fitch |

28.     The Defendants represented that JPMorgan Trust 2006-A4 consisted of

approximately 2,120 loans with an aggregate principal balance of over $1.2 billion from "prime"

borrowers.  The Defendants segregated these loans into five groups with varying numbers of

loans in each group.  The bonds issued by the Trust consisted of several tranches of senior and

subordinate bonds associated with each group of loans, and several tranches of subordinate

bonds associated with the overall pool of mortgage loans. Pittsburgh FHLB purchased a super

senior bond, LAS7, in the face amount of $100 million, which was part of Group 4, which

consisted of 651 loans. (Exhibit 4.) The Defendants represented that the loans in this group had

average credit scores, known as FICO scores, of 745 and average Loan-To-Value ratios (LTVs)

of less than 68%, both indications of "prime" quality borrowers. The credit support or

enhancement that the Defendants built into the structure of the pool was in the form of

subordination. The subordinate bonds associated with the overall pool would absorb the first

losses of nearly 4% of the pool's aggregate principal balance, while the subordinate tranches in

Group 4 could absorb about another 3.6% of the losses in the Group 4 loans. Thus, assuming

that the initial 4% of losses occurred pro-rata across the Groups, the loans in Group 4, which had

aggregate principal balances of about $449 million, would have to experience losses of 7.6%, or

$34 million ($18 million related to subordination bonds and $16 million related to senior support

bonds) before the super senior tranche purchased by Pittsburgh FHLB would experience any

losses. Moody's and Fitch rated the bond purchased by Pittsburgh FHLB as AAA. Pittsburgh

FHLB believed that it had made a safe investment.

29.     However, as of June 25, 2009, the losses in the aggregate pool had not been

distributed pro-rata across all loan groups and the subordination available to all groups had been

used up. As a result, the principal balance of the nonperforming mortgage loans (loans more

than 30 days delinquent) for Group 4 was 6.2% and mortgages more than 90 days delinquent, in

bankruptcy, in foreclosure, and that are real estate owned (REO) totaled $17 million. Group 4

losses therefore exceed the percentage and dollar amount of the support bonds available to Group

4. Group 4 is expected to deteriorate further in the future.

30.    The Defendants represented that JPMorgan Trust 2006-S2 consisted of 2,916 mortgage loans with an aggregate principal balance of about $1.3 billion from "prime" borrowers. The Defendants classified the mortgage loans into three pools or groups, and each of the three pools had two to four subgroups. The bonds issued by the Trust included senior and subordinate bonds that received principal and interest from the mortgage loans, as well as principal only and interest only bonds. Pittsburgh FHLB purchased two senior bonds issued by this Trust, both in Pool or Group 1. (Exhibits 6-7.) The bond assigned YAC4, in the face amount of $84,848,000, was associated with subgroup 1-2 that Defendants represented consisted of 769 loans with average FICO scores of 745 and LTVs of 67%, both indications of "prime" quality borrowers. The bond assigned YAW0, in the face amount of $141,135,235, was associated with subgroup 1-3 that Defendants represented consisted of 1,427 loans with average FICO scores of 735 and average LTVs of 69%, also indications of "prime" quality borrowers. The credit quality of the bonds was enhanced by subordination in the amount of approximately 4.9%. Thus, assuming the 4.9% of losses occurred pro-rata across the groups, the loans would have to experience losses of about $34.7 million before the bonds purchased by Pittsburgh FHLB were affected. Moody's and Fitch rated the bonds purchased by Pittsburgh FHLB as AAA. Pittsburgh FHLB believed that it had made a safe investment.

31.    However, as of June 25, 2009, the principal balance of the nonperforming mortgage loans for Pool 1 was 11.8% and mortgages more than 90 days delinquent, in bankruptcy, in foreclosure, and that are real estate owned (REO) totaled $51 million, which exceed both the estimated percentage and dollar amount of losses before YAC4 and YAW0 would begin to experience losses. Pool 1 is expected to deteriorate further in the future.

32. The Defendants represented that JPMorgan Trust 2007-A5 consisted of 1,595 loans with an aggregate principal balance of approximately $1.1 billion from "prime" borrowers. The Defendants divided the aggregate pool into four sub-pools and the Trust issued senior and subordinate bonds associated with each pool and additional subordinate bonds associated with the aggregate pool. Pittsburgh FHLB purchased two super senior bonds: one assigned BAH7 in the face amount of $367,256,000 and one assigned BAE4 in the face amount of $340,938,000. (Exhibits 11-12.) One of the bonds was associated with Pool 2 that Defendants represented consisted of 588 loans with average FICO scores of 748 and average LTVs of under 74% and the other was associated with Pool 3 that Defendants represented consisted of 532 loans with average FICO scores of 751 and average LTVs of about 68%, all indications of "prime" quality borrowers. The credit quality was supported by about 3.25% for the aggregate pool and, if those losses were distributed pro-rata across the pools, an additional 4% for sub-pools 2 and 3. Thus, assuming the initial 3.25% of losses occurred pro-rata across the Pool, Pools 2 and 3 would have to experience losses of about 7.25% or about $55 million ($28.5 million for sub-pool 2 and $26.5 million for sub-pool 3) before the bonds purchased by Pittsburgh FHLB were affected. S&P and Fitch rated the bonds purchased by Pittsburgh FHLB as AAA. Pittsburgh FHLB believed that it had made a safe investment.

33. However, as of June 25, 2009, the principal balance of the nonperforming mortgage loans for Pool 2 and Pool 3 were 18.2% and 10.9%, respectively, and mortgages more than 90 days delinquent, in bankruptcy, in foreclosure, and that are real estate owned (REO) for Pool 2 and Pool 4 totaled $65 million and $35 million, respectively, which exceed both the estimated percentage and dollar amount of losses before BAH7 and BAE4 experience losses. Pools 2 and 4 are expected to deteriorate further in the future.

34.     The Defendants represented that JPMorgan Trust 2007-A6 consisted of 1,146 loans with an aggregate principal balance of approximately $776,241,600 from "prime" borrowers. The Defendants broke down the aggregate pool into four sub-pools. The bonds issued by the Trust included senior and subordinate bonds associated with each pool and there were also subordinate bonds associated with the aggregate pool. Pittsburgh FHLB purchased two super senior bonds, DAK6 in the face amount of $257,856,000 and DAB6 in the face amount of $302,666,000. (Exhibits 14-15.) One bond was associated with the loans in Pool 2, which the Defendants represented consisted of 488 loans with average FICO scores of 754 and average LTVs of about 72%, both indications of "prime" quality borrowers. The other bond was associated with the loans in Pool 4 which the Defendants represented consisted of 386 loans with average FICO scores of 754 and average LTVs of under 74%, again indications of "prime" quality borrowers. The credit enhancement in the form of subordination provided to the overall aggregate pool was about 3.25% and the credit enhancement provided specifically to Pools 2 and 4 was about 3.25%. If the initial losses impacted the pools on a pro-rata basis, the total credit enhancement available to Pittsburgh FHLB was 6.5%. Thus, assuming the initial 3.25% of losses occurred pro-rata across the Pools, the loans in Pools 2 and 4 would have to experience losses of about 6.5% or $49.4 million ($23.8 million for Pool 2 and $25.6 million for Pool 4) before there would be any impact on the bonds owned by Pittsburgh FHLB. S&P and Fitch rated the bonds purchased by Pittsburgh FHLB as AAA. Pittsburgh FHLB believed that it had made a safe investment.

35.     However, as of June 25, 2009, the principal balance of the nonperforming mortgage loans for Pool 2 and Pool 4 were 13.2% and 4.5%, respectively for each entire pool, and mortgages more than 90 days delinquent, in bankruptcy, in foreclosure, and that are real

estate owned (REO) for Pool 2 and Pool 4 totaled $35 million and $13 million, respectively. Pool 2 exceeds both the estimated percentage and dollar amount of losses before DAB6 experiences a loss. Pools 1, 2 and 3 have effectively used all the subordinated losses and, therefore, Pool 4 exceeds the percentage and dollar amount of the Senior Support bonds related to Pool 4 before DAK6 experiences a loss. Pools 2 and 4 are expected to deteriorate further in the future.

36.　　The Defendants represented that Chase Mortgage Finance Trust Series 2007-A3 consisted of approximately 970 loans with an aggregate principal balance of about $734 million from "prime" borrowers. The Defendants divided the loans into 3 groups each with senior and subordinated tranches associated with each group, and there were also subordinated tranches associated with the aggregate pool. Pittsburgh FHLB purchased a super senior bond, AG4 in the face amount of $128 million. (Exhibit 19.) This bond was associated with Group 1, which the Defendants represented consisted of 196 loans with average FICO scores of 750 and average LTVs of less than 70%, both indications of "prime" quality borrowers. The Defendants also provided for credit enhancement in the form of about 4% for the aggregate pool and an additional 4.35%, assuming pro-rata distribution of initial losses, for the Group 1 loans. Thus, assuming the initial 4.17% of losses occurred pro-rata across the groups, the losses in Group 1 would have to experience losses of about 8.52% or $12.1 million before the bond purchased by Pittsburgh FHLB was affected. Moody's, Fitch, and a third rating agency rated the bond purchased by Pittsburgh FHLB as AAA. Pittsburgh FHLB believed it had made a safe investment.

37.　　However, as of June 25, 2009, the principal balance of the nonperforming mortgage loans for Group 1 was 14.5% and mortgages more than 90 days delinquent, in

bankruptcy, in foreclosure, and that are real estate owned (REO) totaled $15 million, which exceed both the estimated percentage and dollar amount of losses before AG4 would begin to experiences losses. Group 1 is expected to deteriorate further in the future.

**B.    The Credit Rating Process**

38.    JPMorgan worked with the Rating Agencies in an iterative and collaborative process to structure the pools and establish the nature and level of the credit enhancement for the senior tranches. The rating process included two distinct steps:  (1) estimating expected losses or the probability of default and (2) simulating the cash flows. Fitch and S&P evaluated the borrower's ability to meet its financial obligation and therefore the rating is considered an estimate of probability of default. Moody's estimated the expected loss, which is the probability of default times the loss given default, but because of the paucity of data regarding the loss given default, not much difference exists between Moody's methodology and the methodology of Fitch and S&P. To estimate the expected losses or probability of default, the Rating Agencies used historical data to estimate the likely sensitivity of the expected loss or probability of default to underwriting characteristics of the loan, the experience of the originator and servicer, and the local area and national economic conditions. In making its rating determination, Moody's, for example, claims that "all default scenarios and its impacts on the tranches are taken into account," and that it will capture default, loss, and volatility for all aspects of the underlying loans and properties.

39.    Based on the expected losses or the probability of default, the cash flows available to each of the tranches can be simulated. Once the cash flows were simulated, the Rating Agencies and JPMorgan then determined how much credit enhancement would be made available to each tranche.

40.     The ultimate goal of this iterative and collaborative process was to create a structure that could be sold in the market for the greatest profit possible to JPMorgan. JPMorgan pays the Rating Agencies for their structuring help and ratings, and the fees paid to the Rating Agencies for their work on structured finance investments is much greater than the fees they received for rating a corporate bond. Therefore, although they publicly present themselves as independent parties serving the interests of investors, the Rating Agencies have the incentive to help create a structure that is the least expensive to JPMorgan. The least expensive structure is one that has the largest possible percentage of the bonds paying the lowest possible interest rate. The lowest possible interest rate is assigned to bonds of the highest quality, meaning the least likely to incur losses. Bonds rated AAA are deemed to be the bonds the least likely to incur losses. As mentioned above, with respect to investment grade corporate bonds, the rate of default is about 0.1%.

41.     Residential MBS are sold to a limited group of institutional investors who either by mandate, in the case of Pittsburgh FHLB, or by policy, will only invest in AAA-rated bonds. Therefore the goal of the structuring process, to maximize the profits to JPMorgan, was to create a structure with the greatest possible percentage of AAA-rated bonds, and the least amount of credit enhancement. Each Rating Agency was also aware that if it did not provide a AAA rating on a significant portion of the bonds or if it concluded that it lacked sufficient information to provide a rating, the Rating Agency was likely to lose JP Morgan's business to another Rating Agency.

42.     In some instances, the mortgage pools at issue here were structured by JPMorgan and the Rating Agencies to fit the particular needs of Pittsburgh FHLB. For example, the Defendants customized for Pittsburgh FHLB two bonds in JP Morgan Mortgage Trust 2007-A5,

BAH7 and BAE4, to be AAA-rated and provide a coupon rate of 5.52%. To pay for these bonds, and to generate income for its member banks, Pittsburgh FHLB issued its own bonds with coupon rates of 5.2% and 5.05%. The repayment terms on Pittsburgh FHLB's own bond were intended to match the repayment terms expected on the MBS. The underwriter for Pittsburgh FHLB's bond was J.P. Mortgage Securities, which worked with the Rating Agencies to customize the MBS structures and achieve the AAA ratings required by Pittsburgh FHLB. In addition, JPMorgan was familiar with investment practices of Pittsburgh FHLB and knew that it was more likely to invest in particular kinds of loans, such as prime hybrid ARMs, and that Pittsburgh FHLB preferred to see credit enhancement for the particular tranches that it was purchasing at two times the credit enhancement provided to the overall pool. JPMorgan worked with the Rating Agencies to design structures and MBS that would be of interest to Pittsburgh FHLB.

43.     Pittsburgh FHLB is not able to replicate the predictive modeling performed by JPMorgan and the Rating Agencies. Pittsburgh FHLB does not receive loan-by-loan detail on the underwriting characteristics of each loan, nor does it maintain a database of historical performance that can be used to predict the probability of default of any particular loan. Instead, Pittsburgh FHLB is provided with aggregate data about the characteristics of the loans in the pool(s). For example it is provided data about the location of the borrowers, the range of FICO scores, and the range of LTVs. But it is not told whether a particular loan that was originated in California was also made to a borrower with a FICO score of 610 or 750, or whether the LTV on that particular loan was 60% or 85%. It is also not provided information about combined loan to value ratios or CLTVs or debt to income ratios, which are typical items of information gathered by originators and used in determining the borrower's ability to repay the loan. All of that

information, however, was available to JPMorgan and the Rating Agencies. Therefore,

Pittsburgh FHLB necessarily relies on the Defendants to assess and rate the risk of the bonds

offered for investment.

44. Accordingly, the key factors to Pittsburgh FHLB in determining whether to invest

in a particular tranche of a pool of residential mortgage loans, besides the coupon rate and the

type of loans in the pool, are the underwriting standards utilized by the loan originators and the

credit ratings provided by the Defendants, including the level of credit enhancement that is

available to support the bond. With respect to the bonds that are at issue here, the Defendants

fundamentally misrepresented the underwriting standards utilized by the loan originators as well

as the credit quality of the bonds.

### Count I – Fraud
### (Defendants JPMorgan and Rating Agencies)

45. For this claim against Defendants JPMorgan and Rating Agencies, Pittsburgh

FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further

alleges as follows:

46. Pittsburgh FHLB alleges common law fraud against JPMorgan and the Rating

Agencies regarding LAS7, YAW0, YAC4, BAH7, BAE4, DAK6, DAB6, and AG4.

### A. 2006 and 2007 Underwriting Standards

47. Defendants stated in the registration statement, prospectus, and supplemental

prospectus (collectively, "Offering Documents") (Exhibits 1-3, 5, 8-10, 13, 16-18), and verbally,

that the parties who originated the loans employed, at a minimum, "generally accepted

underwriting standards" which provided the originator with sufficient facts to conclude that the

borrower had the ability to repay the loan.

48.     Through the Offering Documents, the Defendants explained their general underwriting standards for the loans pooled in the offered securities. The Defendants represented that they required a prospective borrower applying for a loan to fill out a "detailed" application designed to provide the underwriting officer with pertinent credit information. The Defendants represented that they generally required a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report. They further explained that in most cases—that is, in the majority of circumstances—they obtained employment verification from an independent source (often the employer or through tax documents for self-employed individuals), including, "among other things," the length of employment, current salary, and whether the employment is likely to continue.

49.     The Defendants specifically represented that the originator would make a determination, based on the information provided by the applicant, that the mortgagor's monthly income "will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."

50.     The Defendants also explained that they used "alternative" sets of underwriting criteria "to facilitate the loan approval process." But, the Defendants explained, those "alternative" underwriting processes were generally limited to borrowers "who demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion." The Defendants further explained that the permitted maximum loan-to-value ratios of the "alternative" programs were more restrictive than those for the general underwriting guidelines.

51.     The general underwriting guidelines stated that exceptions to a lender's underwriting may be made "from time to time," but that they would be made "after careful

consideration of certain mitigating factors such as borrower liquidity, employment and

residential stability and local economic conditions." Thus, the Defendants made clear that loan

originators whose loans were in the mortgage loan pools had followed the general underwriting

standards, except under certain, limited circumstances.

52.      Finally, the Defendants explained that to obtain loan approval, an appraisal

conforming to the Uniform Standards of Professional Appraisal Practice adopted by the

Appraisal Standards Board of the Appraisal Foundation was required.  The appraisals had to be

on forms acceptable to Fannie Mae and/or Freddie Mac.  The guidelines generally required an

appraiser or its agent to personally inspect the property and to verify its condition.  The appraisal

would  be based on a market data analysis or recent sales of comparable properties as well.

**B. Individual Originator Underwriting Standards**

53.      In addition to "generally accepted underwriting standards," Defendants detailed

the individual originators' specific underwriting standards.  The following chart lists those

individual originators who issued at least 10% of the loans in the mortgage pool for each

Certificate that was ultimately underwritten by Defendants:

| JP Morgan Issuing Trust, CUSIP & Tranche | Loan Originators & Corresponding Percentages |
|---|---|
| JP Morgan Mortgage Trust 2006-A4<br>CUSIP: 46628LAS7 (Tranche 4-A-3) | - JPMorgan Chase Bank, NA (41.92%)<br>- Countrywide Home Loans, Inc. (24.24%)<br>- PHH Mortgage Corporation (22.2%) |
| JP Morgan Mortgage Trust 2006-S2<br>CUSIP: 46628YAW0 (Tranche 1-A-3)<br>CUSIP: 46628YAC4 (Tranche 1-A-21) | - Chase Home Finance LLC & JPMorgan Chase Bank, NA (39.49%)<br>- M&T Mortgage Corporation (21.35%) |

| JP Morgan Issuing Trust, CUSIP & Tranche | Loan Originators & Corresponding Percentages |
|---|---|
| JP Morgan Mortgage Trust 2007-A5<br>CUSIP: 46632BAH7 (Tranche 3-A-1)<br>CUSIP: 46632BAE4 (Tranche 2-A-1) | - Chase Home Finance LLC & JPMorgan Chase Bank, NA (47.1%)<br>- PHH Mortgage Corp. (33.4%) |
| JP Morgan Mortgage Trust 2007-A6<br>CUSIP: 46632DAK6 (Tranche 4-A-1)<br>CUSIP: 46632DAB6 (Tranche 2-A-1) | - National City Mortgage (31.23%)<br>- PHH Mortgage Corp. (28.92%)<br>- Chase Home Finance LLC (24.18%) |
| Chase Mortgage Finance Trust Series 2007-A3<br>CUSIP: 161639AG4 (Tranche 1-A-7) | - JP Morgan Chase Bank NA (not disclosed) |

54.     Defendants misrepresented the underwriting, lending, and appraisal standards employed by individual loan originators who underwrote the underlying loans associated with the JP Morgan Issuing Trusts, including Chase Home Finance, LLC, JP Morgan Chase Bank, NA, (collectively "Chase Originators"), Countrywide Home Loans, Inc., PHH Mortgage Corporation, M&T Mortgage Corporation, and National City Mortgage, and as detailed in corresponding Offering Documents.   Defendants also omitted material information from the underwriting, lending, and appraisal standards.

**(i)     Chase Originators**

55.     The Chase Originators originated approximately 41.92% of the JP Morgan Mortgage Trust 2006-A4, which included LAS7; 39.49% of the JP Morgan Mortgage Trust 2006-S2, which included YAW0 and YAC4; 47.1% of the JP Morgan Mortgage Trust 2007-A5, which included BAH7 and BAE4; and 24.18% of the JP Morgan Mortgage Trust 2007-A6, which included DAK6 and DAB6.  For AG4, the Offering Documents did not disclose the percentage of pooled loans originated by the Chase Originators.

56.     The Offering Documents stated that Chase Originators' Mortgage loans in each Certificate were "originated in a manner generally consistent, except as to loan amounts, with Fannie Mae or Freddie Mac published underwriting guidelines." (Exhibit 3 at S-26 to S-28; Exhibit 5 at S-37 to S-39; Exhibit 10 at 40 to 41; Exhibit 13 at 52 to 53; Exhibit 18 at S-129 to S-130.) Defendants disclosed that in addition to obtaining an application from the borrower and a three-filed merged credit report for each borrower, the borrowers "employment, income and assets [were] verified." The Chase Originators then made a determination "as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan and other expenses related to the residence . . . as well as to meet other financial obligations and monthly living expenses." The Defendants disclosed that they may depart from their guidelines but only based on "[o]ther credit considerations."

57.     The Chase Originators also used other underwriting criteria for their Reduced Documentation Program, Streamlined Refinance Program, "No Doc" program, and "Stated Income Stated Asset Program" (also called "Simply Signature"). The Defendants explained that these programs generally had higher underwriting standards, such as a lower limit for maximum loan-to-value ratios, a "stronger credit profile (evidenced by a higher minimum FICO credit risk score)," additional "due diligence" on the collateral, or a stronger borrower credit history and profile.

58.     The Underwriting Documents disclosed that the Chase Originators made exceptions and/or variances to their underwriting policies, "[f]rom time to time," "only after careful consideration of certain mitigating factors such as borrower capacity, liquidity, employment and residential stability and local economic conditions."

### (ii)    Countrywide Home Loans, Inc.

59.    Countrywide Home Loans, Inc. ("Countrywide") originated approximately 24.24% of the JP Morgan Mortgage Trust 2006-A4, which included LAS7.

60.    The Defendants' disclosures explained that Countrywide's underwriting standards are applied "to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  (Exhibit 4 at S-28 to S-34.)

61.    The Offering Documents disclosed that "Countrywide generally requires a description of income" from applicants and, if required, obtains employment verification. Countrywide also used FICO scores to assess borrower creditworthiness and likelihood of default over a two-year period.

62.    The Offering Documents further stated that Countrywide generally required that the prospective borrower demonstrate that "the ratio of the borrower's monthly expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income . . . are within acceptable limits."

63.    The Offering Documents further stated that Countrywide allowed for exceptions to its general underwriting guidelines but only "if compensating factors are demonstrated by a prospective borrower."

### (iii)    PHH Mortgage Corporation

64.    PHH Mortgage Corporation ("PHH") originated approximately 22.5% of the underlying loans for JP Morgan Mortgage Trust 2006-A4, which included LAS7; 33.4% of the underlying loans for JP Morgan Mortgage Trust 2007-A5, which included BAH7 and BAE4; and 28.92% of the underlying loans for JP Morgan Mortgage Trust 2007-A6, which included DAK6 and DAB6.

81031904. 2
25

65.     The Offering Documents in which PHH originated some of the underlying loans detailed the specific underwriting standards employed by PHH.  PHH explained that its underwriting standards were established "based upon its knowledge of primary and secondary residential mortgage markets" and that they were intended to "originate investment-quality mortgage loans that are saleable in the secondary market." (Exhibit 4 at S-35 to S-41; Exhibit 10 at 41 to 47; Exhibit 13 at 43 to 49.)

66.     The Offering Documents represented that PHH's "General Underwriting Guidelines" are used for mortgages originated, purchased, and underwritten by PHH Mortgage, and that any exceptions to its guidelines are "made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made *only after careful consideration of certain compensating factors* such as borrower capacity, liquidity, equity, employment and residential stability." (Emphasis added.)   The Offering Documents further represented that PHH used automated underwriting systems in conjunction with other underwriting processes that considered such things as: liquid assets, income, appraisals, credit scores/history, title reports, employment, and other property information.

67.     The Offering Documents represented that PHH's more specific underwriting standards can include approval processes allowing for less documentation than other processes, but which then "have the effect of increasing the relative importance of the credit report and appraisal."

**(iv)     M&T Mortgage Corporation**

68.     M&T Mortgage Corporation ("M&T") originated approximately 21.35% of the underlying loans for JP Morgan Mortgage Trust 2006-S2, which included YAW0 and YAC4.

69.     The Offering Documents for YAW0 and YAC4 in which M&T originated some of the underlying loans detailed the specific underwriting standards employed by M&T.  They explained that M&T's underwriting standards were "applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."  They went on to state that exceptions to the underwriting guidelines are permitted "*where compensating factors are present.*"   (Emphasis added.) (Exhibit 5 at S-39 to S-40.)

70.     The Offering Documents explained that although M&T acquired or originated many loans under "limited documentation" or "no documentation programs" they were based on an established ability of the borrower to repay the loan.  For example, for "limited documentation" programs, M&T stated that it placed "more emphasis . . . on the value and adequacy of the mortgaged property as collateral, the credit history and other assets of the borrower, than on verified income of the borrower."  This was based on a general limitation to "borrowers with credit histories that demonstrate an established ability to repay indebtedness in a timely fashion."  These loans also apparently had more restrictive maximum loan-to-value ratios. For "no documentation" programs, the Offering Documents stated that it emphasized "the value and adequacy of the mortgaged property as collateral and the credit history of the prospective borrower, rather than on verified income and asserts of the borrower."  Again, the Offering Documents stated that "no documentation" programs were generally limited to "borrowers with favorable credit histories and who satisfy other standards for limited documentation programs." The Offering Documents did not disclose what those "other standards" were.

(v)     **National City Mortgage**

71.     National City originated 31.23% of the loans in J.P. Morgan Mortgage Trust

Series 2007-A6, which included DAB6 and DAK6.  The Offering Documents disclosed National

City's underwriting standards, which were similar to those of the other underwriters.  The

Offering Documents explained that National City's "standards are applied to evaluate the

prospective borrower's credit standing and repayment ability and the value and adequacy of the

mortgaged property as collateral."  (Exhibit 13 at 49 to 52.)  They went on to state that the

standards were "applied in accordance with the applicable federal and state laws and regulations"

and that "[e]xceptions to the underwriting standards are permitted where compensating factors

are present."  As with other underwriters, the Offering Documents did not disclose the

"compensating factors."

72.     The Offering Documents also explained National City's evaluation of a

prospective borrower's income:

> In determining whether a prospective borrower has sufficient
> monthly income available (i) to meet the borrower's monthly
> obligation on their proposed mortgage loan and (ii) to meet the
> monthly housing expenses and other financial obligation on the
> proposed mortgage loan, National City Mortgage generally
> considers, when required by the applicable documentation
> program, the ratio of such amounts to the proposed borrower's
> acceptable stable monthly gross income. Such ratios vary
> depending on a number of underwriting criteria, including loan-to-
> value ratios, and are determined on a loan-by-loan basis.

73.     The Offering Documents also explained National City's Full and Alternative

Documentation programs, as well as its Stated Documentation Program.  Under the

full/alternative documentation program, National City verified the employment, income, and

assets of the prospective borrower through written and telephonic conversations covering a two-

year period for employment/income and a two-month period for assets.  Under the stated

documentation program, National City placed more emphasis on the "value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower than on a verified income of the borrower."

### C. Omissions and Misrepresentations

74.    The Defendants made materially false and misleading representations and omissions concerning information in the Certificates' Offering Documents and concerning the ratings of the Certificates, as described below.  These materially false and misleading statements were communicated to, and relied on by, Pittsburgh FHLB, as alleged with particularity below.

75.    The Defendants made the false representations and omissions either knowing of their falsity or with recklessness as to whether the representations were false, as alleged with particularity below.

76.    The Defendants made the materially misleading statements and omissions with the intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh FHLB to buy and retain the Certificates, as alleged with particularity below.

77.    Defendants owed investors, including Pittsburgh FHLB, a duty to disclose all material information, including adverse information, about the Certificates, given JPMorgan's knowledge that Pittsburgh FHLB and other investors would depend on the information in the Offering Documents in making their investment decisions.

### (i)    The Offering Documents Contained Material Misrepresentations and Omissions Regarding Underwriting Standards.

78.    The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to underwriting standards.

79.    Defendants misrepresented that the originators' underwriting guidelines generally required prospective borrowers to fill out a "detailed application designed to provide to the

underwriting officer pertinent credit information." Defendants similarly misrepresented that exceptions to the underwriting guidelines were granted "from time to time . . . after careful consideration of certain mitigating factors." Defendants omitted from its disclosures that the originators were not following their own underwriting standards and that "exceptions" to the guidelines became the rule.

80.     For example, a June 2009 complaint filed by the Securities and Exchange Commission ("SEC") revealed that Countrywide (the originator for 24.24% of the aggregate pool containing LAS7) was aware internally that its own underwriting guidelines were being ignored and that borrowers were lying about their income in the reduced-documentation application process. In an April 13, 2006 email, Countrywide's former chairman of the board and chief executive officer, Angelo Mozilo, wrote other top Countrywide executives identifying that Countrywide was originating home mortgage loans "through our channels with disregard for process [and] compliance with guidelines." Mozilo stated that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." According to the SEC, Countrywide did not disclose any of these material facts to investors.

81.     Similarly, PHH (a significant originator for LAS7, BAH7 and BAE4, and DAK6 and DAB6) admitted in its August 8, 2008 10Q Form that the demand for its mortgages in the secondary market declined due in part to "loans with origination flaws"—loans for which PHH was the originator.

82.     Another example comes from the Chase Originators, which were responsible for originating a significant percentage of every bond at issue. An internal Chase email attached a memorandum outlining "cheats and tricks" to gain approval for risky mortgage loans from the

Zippy system, a Chase Originators' automated loan underwriting system. This "Zippy memo" advised Chase personnel to inflate the borrowers' income or otherwise falsify loan applications. The Zippy memo exhorted brokers to "Never Fear!!" if Zippy rejects a "stated income/stated asset" loan application, "ZiPPY can be adjusted (just ever so slightly)." The Zippy memo encouraged brokers to game the Zippy system because "[i]t's super easy! Give it a try!" This Chase document instructed brokers not to break down income by base, overtime, commissions, or bonuses, but to lump it all into base income. The memo recommended that "[i]f your borrower is getting a gift, add it to the bank account along with the rest of the assets. Be sure to remove any mention of gift funds[.]" As additional measure to attain approval for these risky loans, the author counseled "resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want. Do the same for assets." Chase no longer makes "stated income/stated asset" loans.

83.     Pittsburgh FHLB was not aware at the time these statements were made that the departures from underwriting guidelines admitted by the originators had occurred with respect to loans in the mortgage pools backing the bonds at issue here. However, the default rates that are now evident in the mortgage pools backing the bonds at issue indicate that the failures by the originators did in fact impact the loans in these mortgage pools.

> **(ii)     The Defendants Materially Misrepresented the Risk Associated with the Certificates Based on the Ratings Given to Each Certificate.**

84.     The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to the ratings of each Certificate.

85.     The Defendants misrepresented that the AAA ratings were an accurate reflection of credit quality of the bonds. The AAA credit ratings were assigned to each and every

Certificate purchased by Pittsburgh FHLB, which was a condition precedent to Pittsburgh

FHLB's purchase. The Defendants represented in the Offering Documents that:

> The ratings assigned to mortgage pass through certificates address
> the likelihood of the receipt of all payments on the mortgage loans
> by the related Certificateholders under the agreements pursuant to
> which the certificates are issued. Such ratings take into
> consideration the credit quality of the related mortgage pool,
> including any credit support providers, structural and legal aspects
> associated with such certificates, and the extent to which the
> payment stream on the mortgage pool is adequate to make the
> payments required by such certificates.

(Exhibit 3 at S-80; Exhibit 5 at S-81; Exhibit 10 at 76; Exhibit 13 at 91; Exhibit AG4 at S173.)

However, these statements were false and misleading, and the Defendants knew they were false

and misleading or were reckless in not knowing that these statements were false and misleading.

The Defendants knew that loans had been made without compliance with the represented

underwriting standards, that many of the loans were made without independent verification of

employment, income and/or debt, that fraud (by either the borrower, the loan broker, or the loan

originator) was increasing, and that without accurate information about the loan characteristics

the Rating Agencies' predictive modeling was useless. As a result, the Defendants knew or were

reckless in not knowing that the Rating Agencies were incapable of addressing the likelihood

that the certificateholders would receive the payments they expected, and further failed to reveal

that the rating models were unable to properly examine the relevant and necessary factors for

rating certificates.

86.     It is now apparent that the predictive modeling used by the Rating Agencies was

inadequate to assess the risk of default of the loans in the mortgage pools at issue, and that the

Defendants knew or should have known of those inadequacies. And, since their predictive

modeling was inadequate, Defendants knew or should have known that the level of credit enhancement necessary to give a tranche AAA quality was either inadequate or unknowable.

87.     The inadequacy of the Rating Agencies' predictive models is reflected in the number of recent downgrades of residential MBS. In 2008, Fitch downgraded 1,298 residential MBS that were backed by prime loans. In the five previous years, Fitch downgraded a total of 130 residential MBS backed by prime loans, an average of 30 downgrades per year. In 2008, Fitch downgraded 17.9% of all AAA-rated residential MBS compared to an average of 2.8% for the 1991-2007 period. The downgrades in 2008 were predominantly for bonds issued in 2006 and 2007. If 2006 and 2007 vintage MBS were excluded, only 4.6% of the AAA-rated MBS would have been downgraded.

88.     The models used by the Rating Agencies were particularly unable to predict the performance of no documentation or low documentation loans. This is important to the performance of the bonds at issue here because, even though the pools were designated as "prime," they included numerous loans made with limited or no documentation. The percentage of loans acquired or originated under low or no documentation programs ranged from 42.48% to as high as 65.48% of the aggregate principal balance outstanding. None of the Defendants disclosed to Pittsburgh FHLB that they were unable to predict defaults of loans made under low or no documentation programs. By providing ratings on the bonds at issue the Defendants represented that they had a sufficient factual basis to assign a rating.

89.     The failure of the Rating Agencies' predictive models cannot be explained by changes in housing prices that were unforeseen or unexpected. Empirical studies, the results of which have only recently been available, show that ratings did not fully incorporate information

on mortgage risk factors that were part of the set of information available to the Rating Agencies at the time of the deal.

90.     JPMorgan and the Rating Agencies worked together to structure the tranches and assign them credit ratings. JPMorgan obtained the ratings for the Certificates from the Rating Agencies and then provided the misleading AAA credit ratings to Pittsburgh FHLB, with the Rating Agencies' knowledge, participation, and approval.

91.     JPMorgan had the motive and opportunity to commit fraud. JPMorgan earned its fees by selling the MBS. JPMorgan knew that Pittsburgh FHLB would buy only AAA, investment-grade MBS. In fact, the AAA rating was a condition precedent to the offering of the Certificates. Consequently, JPMorgan needed the Rating Agencies to assign the AAA credit rating to the tranches in order to sell the Certificates to Pittsburgh FHLB, thereby allowing JPMorgan to receive its fees. JPMorgan exerted its influence over the Rating Agencies and the issuance of the ratings. JPMorgan then distributed to Pittsburgh FHLB the Offering Documents containing the false and misleading ratings and orally communicated the same to Pittsburgh FHLB.

92.     The Rating Agencies had the motive and opportunity to commit fraud. The Rating Agencies sought JPMorgan's business because they received higher-than-usual fees for rating structured financial products such as residential MBS. Rating structured financial products was very lucrative for the Rating Agencies. For example, Moody's net income grew from $159 million in 2000 to $705 million in 2006, with 44% of its revenue in 2006 coming from its structured financial products activities. The Rating Agencies knew that if they either refused to assign the AAA rating to the Certificates or admitted to JPMorgan that they did not have sufficient information to rate these Certificates, JPMorgan would have taken its business

elsewhere. The Rating Agencies were responsible for determining and issuing their credit ratings, and they devised the models that produced the AAA ratings for the Certificates.

93.     The ratings constituted a representation that the Defendants had sufficient facts to provide those ratings. They omitted, therefore, that the Defendants did not have sufficient facts to provide the ratings. To the extent that the Defendants may claim the ratings are opinions, the ratings were nonetheless fraudulent because the Defendants did not genuinely and reasonably believe them and they were without basis in fact.

     **(iii)    The Risk Factors Purported to Be Complete but Failed to Disclose Material Information.**

94.     The Offering Documents contained materially false and misleading information and/or contained material omissions with respect to the risk factors associated with the Certificates.

95.     Defendants made general statements in the 2006 Offering Documents concerning certain "Risk Factors," but these statements did not disclose or otherwise correct the false and materially misleading information contained in the Offering Documents regarding the underwriting process and standards supposedly adhered to by loan originators, the quality of the underlying loans, and the adequacy of the Rating Agencies' predictive modeling to assess the risk of default and determine the proper level of credit enhancement.

96.     In their 2007 Offering Documents, Defendants made similar risk factor statements, but added some new risk factors including a recognition of recent developments in the subprime residential mortgage market. Despite that acknowledgement, Defendants distinguished the type of loans in the offered MBS from distressed ones and still assigned the Certificates the highest rating possible, AAA, indicating that these MBS were of the highest quality with virtually no risk of default. Nor did the Defendants disclose that the Rating

Agencies' predictive modeling was inadequate to assess the default risk and establish credit
enhancements for the Certificates.

97.     These risk factors statements created the misleading impression that the
Defendants were disclosing all material risk factors to Pittsburgh FHLB, but these risk factor
statements did not disclose the Defendants' material misrepresentation about the underwriting
standards actually used in making the mortgage loans and about the real credit quality of the
AAA-rated tranches.

**D.  The Impact on Pittsburgh FHLB**

98.     Pittsburgh FHLB justifiably relied on the Defendants' materially misleading
statements and omissions in the Offering Documents and ratings because they went to the core of
Pittsburgh FHLB's investment decision regarding the Certificates.  The Offering Documents and
statements contained therein, and the ratings, indicated the amount of risk associated with the
Certificates, as well as the likelihood of expected return on the investment associated with the
Certificates.  The Certificates would have been unmarketable and would not have issued but for
Defendants' false and misleading representations and omissions.  Indeed, Plaintiff would not
have even been able to purchase the Certificates with a lower rating than those given to the
Certificates.

99.     The misrepresentations and omissions of material fact made by the Defendants
have had a substantial impact on Pittsburgh FHLB.  All of the bonds that it purchased from the
Defendants at issue here have been significantly downgraded from their initial AAA rating.  In
fact, each of the bonds now carries a rating of either CCC or CC, according to Fitch, which
indicates that the likelihood of full payment on the bonds is extremely speculative.  Fitch has
reported for each of these bonds what it has determined to be the "bond break loss" which is the

percentage of remaining principal balances that can be charged off to junior tranches before the

bonds begin to incur losses. Fitch has also reported the estimated current loss for each bond. To

the extent the total current loss exceeds the bond break loss, the bonds will incur losses. For

example, Fitch estimates the "bond break loss" of DAB6 as 6.50% and estimates the total

current loss at 9.61%, which means that the coverage ratio (estimated current loss divided by

bond break loss) is 0.68. Any coverage ratio less than 1.00 means that the bond will incur losses.

Fitch has also projected the defaults on remaining mortgages in the pools supporting the bonds.

The information reported by Fitch, on September 10, 2009, is summarized below:

| Bond | Rating | Coverage Ratio | Projected Default on Remaining Mortgages |
|---|---|---|---|
| LAS7 | CCC | 0.88 | 19% |
| YAW0 | CCC | 0.67 | 15% |
| YAC4 | CCC | 0.67 | 15% |
| BAH7 | CCC | 0.57 | 21% |
| BAE4 | CC | 0.47 | 21% |
| DAK6 | CCC | 0.82 | 18% |
| DAB6 | CCC | 0.68 | 18% |
| AG4 | CC | 0.48 | 22% |

As reflected by the coverage ratio (estimated current loss divided by bond break loss), which is

less than 1.00 in all instances, each of these bonds will incur losses.

100.    In light of these estimates, each of the bonds is currently trading well below its

par value. The current price of the bonds as a percentage of par is set forth below:

| LAS7 | 60% |
|---|---|
| YAW0 | 61% |
| YAC4 | 61% |

| BAH7 | 68% |
|------|-----|
| BAE4 | 57% |
| DAK6 | 69% |
| DAB6 | 67% |
| AG4  | 61% |

As a result, beginning in the fourth quarter of 2008 and continuing through its most recent reporting period, Pittsburgh FHLB has reported an OTTI adjustment on some of these bonds.

101.   In addition to the substantial financial losses that Pittsburgh FHLB has experienced and will experience, the Defendants' conduct has also affected the members of Pittsburgh FHLB and their communities. As mentioned above, because of the conduct of the Defendants (and others), Pittsburgh FHLB announced in late December 2008 that it was suspending its dividends to its members. Shortly thereafter it also announced that it was suspending its charitable program of providing assistance with closing costs and down payments for certain first-time home buyers.

102.   Pittsburgh FHLB's injuries are the proximate result of Defendants' fraudulent conduct, misrepresentations, and omissions, as pled with particularity above, in an amount to be determined at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count II – Negligent Misrepresentation
### (Defendants Rating Agencies and JPMorgan)

103.    For this claim against Defendants Rating Agencies and JPMorgan, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

104.    Pittsburgh FHLB alleges negligent misrepresentation against Defendants JPMorgan and Rating Agencies regarding LAS7, YAW0, YAC4, BAH7, BAE4, DAK6, DAB6, and AG4.

105.    JPMorgan included materially false and misleading information in the Certificates' Offering Documents.  The Rating Agencies assigned materially false and misleading credit ratings to the Certificates.  This false and misleading information was communicated to, and relied on by, Pittsburgh FHLB, as pled with particularity above.

106.    The Defendants made materially false and misleading representations and omissions concerning the quality of the Certificates, which were communicated to Pittsburgh FHLB, as pled with particularity above.

107.    JPMorgan made false and misleading representations in the course of their business as issuers of Certificates, and had a pecuniary interest therein.  The Rating Agencies made false and misleading representations in the course of their business as raters of Certificates and had a pecuniary interest therein.  The Rating Agencies had an incentive to assure that the investments offered in the Certificates received AAA ratings.  The Rating Agencies received higher compensation for rating structured investment products.  If the bonds had not been rated AAA, the Rating Agencies would not have been paid.

108. JPMorgan had a duty to conduct a reasonable investigation of the truthfulness of their representations as the information presented concerned the quality of the Certificates. The Rating Agencies held special expertise in their ability to rate the Certificates and had a duty to conduct a reasonable investigation of the truthfulness of their representations regarding the credit ratings assigned to the Certificates.

109. It was foreseeable to Defendants that Pittsburgh FHLB, one of the investors, would rely on the information concerning the quality of the Certificates presented by them and the ratings assigned by the Rating Agencies. The ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

110. The Defendants knew at all times of Pittsburgh FHLB to whom the false and misleading credit ratings would be communicated. The credit ratings were solicited and paid for by JPMorgan so that JPMorgan could offer the Certificates for investment to Pittsburgh FHLB. The ratings were not offered gratuitously or as a report for a general interest publication. Both JPMorgan and the Rating Agencies understood that the potential investors who would rely on the ratings were a limited number of institutional investors with specific requirements regarding investing only in AAA-rated bonds. In some instances, the bonds were structured to the specific needs of Pittsburgh FHLB.

111. Defendants knew at all times that Pittsburgh FHLB to whom the false and misleading credit ratings and underwriting standards were communicated, would and did rely on their misrepresentations and omissions, as pled with particularity above.

112. Pittsburgh FHLB justifiably relied on the Defendants' materially misleading statements and omissions in the Offering Documents and ratings as pled above.

113.    Pittsburgh FHLB suffered injury by acting in justifiable reliance on the misrepresentations and omissions contained in the Offering Documents and the Rating Agencies' misrepresentations and omissions, as pled with particularity above, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count III – Violation of the Pennsylvania Securities Act of 1972
### (Defendants JPMorgan)

114.    For this claim against Defendants JPMorgan, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

115.    Pittsburgh FHLB brings this count pursuant to the Pennsylvania Securities Act of 1972, 70 P.S. §1-501, against JPMorgan regarding LAS7, YAW0, YAC4, BAH7, BAE4, DAK6, DAB6, and AG4.

116.    JPMorgan misrepresented the underwriting standards that were used in making the loans that were in the mortgage loan pools and misrepresented the credit quality of AAA-rated bonds issued from each Trust purchased by Pittsburgh FHLB, as pled with particularity above.

117.     JPMorgan and the Rating Agencies worked together to structure the tranches and assign them credit ratings. JPMorgan obtained the ratings for the Certificates from the Rating Agencies and then provided the misleading AAA credit ratings to Pittsburgh FHLB, with the Rating Agencies' knowledge, participation, and approval, as pled with particularity above.

118.     The ratings constituted a representation of fact that JPMorgan had sufficient facts to provide those ratings. To the extent that JPMorgan may claim the ratings are opinions, the ratings were nonetheless fraudulent because JPMorgan did not genuinely and reasonably believe them and they were without basis in fact.

119.     JPMorgan had the motive and opportunity to commit fraud, as pled with particularity above.

120.     JPMorgan offered and sold the Certificates by means of the Offering Documents, which included the registration statement, prospectus, supplemental prospectus, and oral communication. The Offering Documents each contained untrue statements of material facts. The Offering Documents also omitted to state material facts required to be stated therein, or omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading, as pled with particularity above.

121.     JPMorgan knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Offering Documents, as pled with particularity above.

122.     JPMorgan made the materially misleading statements and omissions with the intent that Pittsburgh FHLB rely on the statements and for the purpose of inducing Pittsburgh FHLB to buy and retain the Certificates, as pled with particularity above.

123.    JPMorgan made the material misrepresentations and/or omissions of material fact in connection with the sale of the securities LAS7, YAW0, YAC4, BAH7, BAE4, DAK6, DAB6, and AG4.

124.    Pittsburgh FHLB justifiably relied on JPMorgan's materially misleading statements and omissions in the Offering Documents as pled above.

125.    All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from Pittsburgh FHLB's reliance on JPMorgan's material misrepresentations and omissions, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against JPMorgan, jointly and severally, for all damages sustained as a result of JPMorgan's wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count IV – Violation of § 11
### (Defendants Rating Agencies and JPMorgan)

126.    For this claim against Defendants JPMorgan and Rating Agencies, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

127. Pittsburgh FHLB brings this count pursuant to section 11 of the 1933 Act, 15 U.S.C. § 77k, against JPMorgan and the Rating Agencies regarding BAH7, BAE4, DAK6, DAB6 and AG4.

128. Pittsburgh FHLB purchased the securities from the Defendants, as displayed in the chart in paragraph 27, pursuant to the Offering Documents, which included the registration statement, prospectus, and supplemental prospectus, and the ratings from the Rating Agencies.

129. JPMorgan purchased the Certificates from the issuing Trust with an intent to distribute them, or to offer or sell the Certificates in connection with the distribution.

130. The Rating Agencies also acted as underwriters in the sale of the Certificates. The Rating Agencies participated in the distribution of the Certificates, participated in the structuring of the MBS, participated in establishing the necessary level of credit enhancements required for a Certificate's particular credit rating, and participated in the preparation of the Offering Documents. The Rating Agencies were necessary to the distribution of the Certificates.

131. The Offering Documents and ratings, and corresponding oral and written representations, contained untrue statements of material facts. The Offering Documents and ratings also omitted to state material facts required to be stated therein, or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

132. JPMorgan and the Rating Agencies had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in the Offering Documents not misleading.

133.    JPMorgan and the Rating Agencies knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Offering Documents.

134.    JPMorgan and the Rating Agencies did not have a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and that there were no omissions of material facts necessary to make the statements contained therein not misleading.

135.    When Pittsburgh FHLB purchased the Certificates, Plaintiff did not know that the Defendants' statements were untrue and did not know that Defendants' statements contained material omissions.  In the exercise of reasonable care, Pittsburgh FHLB could not have known that the statements were untrue and/or omitted material facts at the time Plaintiff purchased the Certificates.

136.    Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action.  Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time Pittsburgh FHLB filed this complaint, or between the time other plaintiffs proceeding as class representatives, filed complaints regarding the same Certificates.

137.    All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from JPMorgan's and the Rating Agencies' untrue statements and/or omissions of material facts in the Offering Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count V – Violation of § 12
### (Defendants JPMorgan)

138. For this claim against Defendants JPMorgan, Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

139. Pittsburgh FHLB brings this count pursuant to section 12 of the 1933 Act, 15 U.S.C. § 77l, against JPMorgan regarding BAH7, BAE4, DAK6, DAB6 and AG4.

140. JPMorgan offered and sold the Certificates by means of the Offering Documents, which included the registration statement, prospectus, supplemental prospectus, and oral communication. As pled with particularity above, the Offering Documents contained untrue statements of material facts. The Offering Documents also omitted to state material facts required to be stated therein, or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

141. JPMorgan used the mails or interstate commerce in the offer and sale of the Certificates.

142.    JPMorgan had a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained in the Offering Documents not misleading.

143.    JPMorgan knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Offering Documents.

144.    When Pittsburgh FHLB purchased the Certificates, Pittsburgh FHLB did not know that the Certificates' statements were untrue and did not know that the Certificates contained material omissions. In the exercise of reasonable care, Pittsburgh FHLB could not have known that the statements were untrue and/or omitted material facts at the time Pittsburgh FHLB purchased the Certificates.

145.    Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action. Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time the Pittsburgh FHLB filed this complaint, or between the time other investors preceding as class representatives, filed complaints regarding the same certificates.

146.    Pittsburgh FHLB purchased the securities from the Defendants, as displayed in the chart in paragraph 27.

147.    All losses sustained by Pittsburgh FHLB associated with the securities at issue resulted from JPMorgan's untrue statements and/or omissions of material fact in the Offering Documents, in an amount to be proved at trial.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against JPMorgan, jointly and severally, for all damages sustained as a result of JPMorgan's wrongdoing, in an amount to be proven at trial, including interest thereon;
- Awarding rescission or a rescissory measure of damages; and
- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

### Count VI – Violation of § 15
### (Defendant J.P. Morgan Chase & Co.)

148.    For this claim against Defendant J.P. Morgan Chase & Co., Pittsburgh FHLB incorporates by reference all preceding paragraphs as if fully set forth herein except that for the purposes of this count, Pittsburgh FHLB expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

149.    Pittsburgh FHLB brings this count pursuant to section 15 of the 1933 Act, 15 U.S.C. § 77o, against J.P. Morgan Chase & Co regarding BAH7, BAE4, DAK6, DAB6, and AG4.

150.    J.P. Morgan Chase & Co., by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein, a controlling person, within the meaning of Section 15 of the Securities Act, of J.P. Morgan Securities Inc., J.P. Morgan Acquisition, JPMorgan Acceptance, Chase Home Finance L.L.C., and Chase Mortgage Finance.

151. J.P. Morgan Chase & Co. had the power to influence and exercised that power to control the general affairs and policies of J.P. Morgan Securities Inc., J.P. Morgan Acquisition, JPMorgan Acceptance, Chase Home Finance L.L.C., and Chase Mortgage Finance.

152. J.P. Morgan Securities Inc., J.P. Morgan Acquisition, JPMorgan Acceptance, Chase Home Finance L.L.C., and Chase Mortgage Finance violated Sections 11 and 12 of the Securities Act.

153. Pittsburgh FHLB was without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered the facts more than one year before the commencement of this action. Less than three years have elapsed between the time the securities upon which this count is based were offered to the public and the time the Pittsburgh FHLB filed this complaint, or between the time other investors preceding as class representatives, filed complaints regarding the same certificates.

154. By virtue of the wrongful conduct alleged herein, J.P. Morgan Chase & Co. is liable to Plaintiff.

WHEREFORE, Pittsburgh FHLB prays for relief and judgment as follows:

- Awarding compensatory damages in excess of $25,000 in favor of Pittsburgh FHLB against J.P. Morgan Chase & Co., for all damages sustained as a result of J.P. Morgan Chase & Co.'s wrongdoing, in an amount to be proven at trial, including interest thereon;

- Awarding rescission or a rescissory measure of damages; and

- Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court, plus attorneys' fees and costs of suit.

**JURY DEMAND**

Pittsburgh FHLB hereby demands a trial by jury.

Respectfully submitted,

LYNCH WEIS, LLC

Daniel P. Lynch
PA ID No. 68280
William J. Wyrick
PA ID No. 70656
501 Smith Drive, Suite 3
Cranberry Twp., PA 16066
(724) 776-8000 (Telephone)
(724) 776-8001 (Facsimile)
*Counsel for Plaintiff*